1   WILLIAM A. COHAN, P.C.
    ATTORNEY AT LAW
2   California Bar No. 141804
    Colorado Bar No. 7426
3   P.O. Box 3448
    Rancho Santa Fe, CA  92067
4   (858) 832-1632; (858) 832-1845 (FAX)
    E-mail: bill@williamacohan.com
5
    Attorney for Plaintiff
6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10  CINDY A. MORT, individually and as        )    CASE NO. CV 04-9171 GPS (SSx)
    SURVIVING JOINT TENANT OF THE             )
11  ESTATE OF ALFRED WILLIAM MORT,            )  **NOTICE OF MOTION AND MOTION TO: 1)**
                                              )  **VACATE STIPULATED ORDER STAYING**
12                        Plaintiff,          )  **CASE PENDING COMPLETION OF**
                                              )  **ARBITRATION PROCEEDINGS (CR #37);**
13          v.                                )  **AND 2) STAY OF ARBITRATION**
                                              )  **PENDING RESOLUTION OF MOTION**
14  THE DIVERSIFIED GROUP, INC., et al.       )  **TO VACATE**
                                              )
15                                            ) DATE: Monday, August 25, 2008
                          Defendants.         ) TIME: 1:30 P.M.
16                                            ) DEPT: 7
                                              )
17                                            ) HON. GEORGE P. SCHIAVELLI
                                              ) U.S. District Court Judge
18  _____ )

19          **PLEASE TAKE NOTICE** that on August 25, 2008, at 1:30 p.m., or as soon thereafter as

20  counsel may be heard in Courtroom 7 of the above-entitled Court located at 312 N. Spring Street,

21  Los Angeles, California 90012, Plaintiff Cindy Mort will and hereby does move this Court for an

22  Order (1) vacating the Stipulated Order entered on March 25, 2006, (CR #37) staying the instant case

23  pending completion of arbitration proceedings; and (2) staying the arbitration pending resolution of

24  matters before this Court.

25          This notice of motion and motion is based on information disclosed during settlement

26  discussions on June 18, 2008, which revealed that  agreement to the arbitration clause  in the AD FX

27  Global Fund LLC Operating Agreement entered into by and between Plaintiff Mort and Defendants

28  the  Diversified  Group  Inc.("DGI"   and  James  Haber  ("Haber")  was  fraudulently  induced  by

    concealment of material facts which DGI and Haber had a duty to disclose, as more fully set forth

1  in the attached memorandum of points and authorities and exhibits attached hereto, the reply to any

2  opposition to this motion, all pleadings and documents on file in this case, and the arguments of

3  counsel.

4          This motion is made following conference with William B. Wachtel, Esq., counsel for

5  Defendants DGI and Haber in the arbitration proceeding (AAA No. 13-152-Y-001036-05), pursuant

6  to Local Rule 7-3 which took place on Friday, July 18, 2008.  Further, during the July 18, 2008,

7  conference Attorney Wachtel advised undersigned counsel that Defendants DGI and Haber do not

8  object to the filing of the instant motion.

9          On Tuesday, July 22, 2008, Plaintiff Mort advised the arbitration panel that she would be

10  filing the instant motion no later than July 30, 2008.  On Friday, July 25, 2006, Richard H.

11  Silberberg, Esq., Arbitration Chair, entered the following order for the panel:

12          Based on the representation of the Claimants' counsel that the Claimant will file a

13          motion in California federal court by July 30, 2008 to vacate the stipulation and order

14          compelling arbitration, and to stay this arbitration proceeding pending the disposition

15          of such motion, the Panel directs, with the consent of the Parties, that the existing

16          deadlines in this arbitration proceeding be vacated, and that the evidentiary hearing

17          dates be continued pending the disposition of such motion.  The Panel requests that

18          the Claimant's counsel notify the Panel when the Claimant's motion has been filed,

19          and that the Parties promptly advise the Panel when the Court has rendered a decision

20          on the motion.

21          RESPECTFULLY SUBMITTED this 30th day of July, 2008.

22                          WILLIAM A. COHAN, P.C.

23                          By:s/ *William A. Cohan*
                                WILLIAM A. COHAN
24
25                          Attorney for Plaintiff
                            CINDY A. MORT

26

27

28

1

**CERTIFICATE OF SERVICE**

2          I am a resident of the State of California, over the age of eighteen years, and not a party to
the within action.  My business address is William A. Cohan, P.C., P.O. Box 3448, Rancho Santa
3    Fe, CA 92067.  On July 30,  2008 , I did serve the foregoing NOTICE OF MOTION AND MOTION
TO: 1) VACATE STIPULATED ORDER STAYING CASE PENDING COMPLETION OF
4    ARBITRATION PROCEEDINGS; AND 2) FOR AN ORDER STAYING ARBITRATION
PENDING RESOLUTION OF MATTERS BEFORE THIS COURT, via CM-ECF filing system to
5    the following:

6          **Attorney for Defendants DGI and Haber**
Elliot Silverman, Esq.
7    McDERMOTT WILL & EMERY LLP
18191 Von Karman Avenue, Suite 400
8    Irvine, CA 92612-7107
Email: esilverman@mwe.com

9          I further certify that on this date, I will serve the following with a true and correct ECF- filed
10   copy of this Notice of Motion and Motion and attached Memorandum and Exhibits, via e-mail on
the following:

11

**Arbitration Counsel for Defendants DGI and Haber:**
12   William B. Wachtel, Esq.
Howard Kleinhendler, Esq.
13   WACHTEL & MASYR, LLP
110 East 59th Street
14   New York, NY 10022
E-mail: hkleinhendler@wmllp.com

15

**American Arbitration Association**:
16   Hannah R. Cook
Commercial Case Manager
17   Email: Cookh@adr.org

18   **Arbitration Panel:**
Richard H. Silberberg, Esq., Chair   Email: Silberberg.richard@dorsey.com
19   Larry, Biblo, Esq., Arbitrator         Email: bib4040@aol.com
Michael A. Levy, Esq., Arbitrator    Email: MALevy@LevyandSchneps.com
20

21                                                           s/ Alicia Cisneroz
Alicia Cisneroz, Legal Assistant
22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**PAGE:**

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

II. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9

A. This Court Has Jurisdiction To Vacate 3/28/05 Order . . . . . . . . . . . . . . . . .    9

B. This Count, Not The Arbitrators, Must Decide Whether Haber Fraudulently
Induced Mort To Agree To The Arbitration Clause. . . . . . . . . . . . . . . . . . . .    10

C. Mort's Agreement To The Arbitration Clause Was Induced By Fraudulent
Concealment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11

D.   Fraud In The Inducement To Settle Is Persuasive Evidence Of Fraud In The
Inducement Of Agreement To The Arbitration Clause . . . . . . . . . . . . . . . .    13

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

EXHIBIT 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

EXHIBIT 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

**TABLE OF AUTHORITIES**

**CASE AUTHORITY**                                                **PAGE:**

*Ajettix Inc. v. Raub,*
        3 Misc3d 908, 804 N.Y.S.2d 580 (N.Y.Sup. 2005) . . . . . . . . . . . . . .    13

*A T & T Technologies Inc. v. Communications Workers*,
        475 U.S. 643 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10

*Danann Realty Corp. v. Harris,*
        5 N.Y.2d 317, 184 N.Y.S.2d 599 (1959) . . . . . . . . . . . . . . . . . . . . . .    11-12

*Davis v. CCF Capital Corp,*
        277 A.D.2d 342, 717 N.Y.S.2d 207 (N.Y.A.D. 2nd Dept., 2000) . . .    12

*Doctor's Associates, Inc. v. Casarotto,*
        517 U.S. 681 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11

*EBCI, Inc. v. Goldman Sachs & Co.,*
        5 N.Y.3d 11, 799 N.Y.S.2d 170 (2005) . . . . . . . . . . . . . . . . . . . . . . . .    12

*Fuku-Bonsai, Inc. v. E.I. Du Pont de Nemours and Co.,*
        187 F.3d 1031 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    13

*Green Tree Financial Corp.-Alabama v. Randolph,*
        531 U.S. 79 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9

*In re E.I. du Pont,*
 No. 4:95-CV-36 (HL)(M.D.Ga. 1998) . . . . . . . . . . . . . . . . . . . . . . . .   13

*Kaufman v. Cohen,*
 307 A.D.2d 113, 760 N.Y.S.2d 157 (N.Y.Sup. 2003) . . . . . . . . . . .   13

*Kornman & Assoc., Inc. v. United States,*
 527 F.3d 443 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

*Lerner v. Fleet Bank, N.A.,*
 459 F.3d 273 (2nd Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

*Living Designs, Inc. v. E.I. Dupont de Nemours and Co.,*
 431 F.3d 353 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

*Matsuura v. Alston & Bird, P.C.,*
 166 F.3d 1006 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
 473 U.S. 614 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10-11

*Mort v. DGI, et al.,*
 AAA Case No. 13 152 Y 01036 05 . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

*Nagrampa v. Mailcoups, Inc.,*
 469 F.3d 1257 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.,*
 388 U.S. 395 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

*Sabo v. Delman,*
 3 N.Y.2d 155, 164 N.Y.S.2d 714 (N.Y. 1957) . . . . . . . . . . . . . . . . .   11

*Sanford v. MemberWorks, Inc.,*
 483 F.3d 956 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9-10

*Steward v. Jackson & Nash,*
 976 F.2d 86 (2nd Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

*Talansky v. Schulman,*
 2 A.D.3d 355, 770 N.Y.S.2d 48 (N.Y.A.D. 1 Dept 2003) . . . . . . . . .   12

*United States v. Philatelic Leasing, Ltd.,*
 601 F.Supp. 1554 (S.D.N.Y. 1985), *aff'd,*
 794 F.2d 781 (2nd Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

*United States v. Stein,*
 Case No. S1-05-CR-888 (LAK) (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . .   4

**STATUTES AND RULES**             **PAGE:**

9 U.S.C. §2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10,11

9 U.S.C. §4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10

Federal Rules of Criminal Procedure
       Rule 6(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

**OTHER AUTHORITIES**                                                    **PAGE:**

*U.S. Tax Shelter Industry: The Role of Accountants, Lawyers and Financial Professionals,* U.S. Senate Permanent Subcommittee on Investigations,
   Minority Report dated November 18 & 20, 2003 . . . . . . . . . . . . . . . . . . . . .    7, 8

1  **I.      INTRODUCTION.**

2         In or about 1996, KPMG, one of the four largest accounting firms in the United States,

3  entered into joint venture alliances with "boutique" investment firms such as The Diversified Group

4  ("DGI") and nationally acclaimed law firms such as Sidley Austin Brown & Wood ("Sidley"), and

5  Jenkens & Gilchrist in order to develop and market a series of tax shelter schemes involving foreign

6  currency options to high-net-worth individuals.  The promoters marketed the schemes under a variety

7  of acronyms, including: "OPS" (Option Partnership Strategy)[1], "COBRA" (Currency Options Bring

8  Reward Alternatives), "BLIPS" (Bond Linked Issue Premium Structure), "FLIP" (Foreign Leveraged

9  Investment Program), and "OPIS" (Offshore Portfolio Investment Strategy). The IRS and others

10 subsumed this series of tax shelter schemes under the rubrics "BOSS" and "SON OF BOSS."[2]

11        Mrs. Mort's late husband, Fred,[3] sold his sports memorabilia business Fantastic Sports

12 (located in San Diego, California) in the Spring of 1999, which generated a capital gain of

13 approximately six million dollars, thus incurring significant state and federal income tax liabilities.

14 During the same time frame in which Mr. Mort was negotiating the sale of Fantastic Sports, Fred

15 was seeking professional counsel and advice concerning optimal investment opportunities and tax

16 planning to invest the proceeds of the sale of his business, jointly owned with his wife Cindy.

17 Ultimately, KPMG referred Morts' accountants to DGI and Haber to set up a purported  investment-

18

19        [1] The OPS strategy was referred to by various names, including Short Option Strategy, Spread

20 Option Strategy, Split Option Strategy, SOS, Binary Option, Digital Option, Gain Mitigator, Loss
   Generator, COINS, BEST, and FX Transaction.

21

22        [2] "'BOSS' is an acronym for 'Bond and Option Sales Strategy' and refers to an abusive tax
   shelter. ... Son of BOSS is a variation of the slightly older BOSS tax shelter. ...  Although there are

23 several variants of the Son of BOSS tax shelter .... 'Son of BOSS' uses a series of contrived steps
   in a partnership interest to generate artificial tax losses designed to offset income from other

24 transactions.' ... In Notice 2000-44 ('Tax Avoidance using Artificially High Basis'), which was
   published on September 5, 2000, the IRS alerted taxpayers that the Son of BOSS scheme had been

25 'listed' as an abusive shelter....'" *Kornman & Assoc., Inc. v. U.S.,* 527 F.3d 443, 446 n. 2 (5th Cir.

26 2008) (citations omitted) (affirming summary judgment in favor of government; holding that
   partnership's obligation to close a short sale of U.S. Treasury notes with face value of $100 million

27 was a partnership liability).

28        [3] Mr. Mort passed away in January, 2003.

tax shelter program for them.  On December 1, 1999, the Morts paid Lehman Brothers $200,000 and entered into two over-the-counter-non-publicly traded foreign currency option transactions with Lehman Brothers, and paid DGI $350,000. in "advisory fees" to participate in one of DGI's OPS schemes.  Despite its Byzantine complexity and the wealth, power, size and venerable reputations of the promoters, Defendants' fraud scheme unraveled in the wake of Congressional, Department of Justice and Internal Revenue Service civil and criminal investigations.

On October 19, 2004, Cindy Mort ("Mort"), individually and as surviving joint tenant of the estate of  Alfred ("Fred") Mort, filed her Complaint in the United States District Court for the Southern District of California against Sidley, Raymond J. Ruble ("Ruble"), DGI and James Haber ("Haber")[4] for damages for: (1) Breach of Fiduciary Duty; (2) Fraud; (3) Fraudulent Nondisclosure; (4) Negligent Misrepresentation;  (5) Negligent Nondisclosure;  (6) Conspiracy to Commit Fraud; (7) Aiding and Abetting Fraud; and (8) Aiding and Abetting Breach of Fiduciary Duty (Case No. 04-CV-2091-TJW).[5]  On October 28, 2004, the district court *sua sponte* entered an Order transferring the case to this Court in the Central District (Case No. CV-04-9171-GPS(SSx).

**II.    STATEMENT OF FACTS.**

1.    On January 13, 2005, Sidley filed a Motion to Compel Arbitration and Stay All Proceedings with Supporting Declarations by it's counsel Gregory J. Weingart, Esq. ("Weingart"), and  David S. Gronsman , Esq. ("Gronsman"), an associate attorney with the Sidley law firm, and Operating Agreement of AD FX Global Fund LLC ("Agreement") attached to Gronsman's Declaration as Exhibit A (CR #26).

2.    Weingart's Declaration states in pertinent part:

3.  I have spoken with Elliot Silverman, counsel for Defendants Diversified Group Incorporated ("DGI") and James Haber ("Haber"),

_____

[4] Haber, a C.P.A. and self-proclaimed financial and tax expert, is the president and founder of DGI (hereinafter referred to collectively as "Haber").

[5] Following Defendants Sidley's and Ruble's settlement with Mort, this Court entered an Order on January 29, 2008, dismissing  Mort's complaint against the Sidley and Ruble Defendants with prejudice. CR # 58.

1      regarding this motion to compel arbitration. **Mr. Silverman**

2      **informed me that, should DGI's motion to dismiss for lack of**

3      **subject matter jurisdiction be denied, he will seek to compel**

4      **arbitration of this matter.** [Emphasis added].

5      3.      Section 13.6 of the Agreement states in pertinent part:

6      <u>Arbitration.</u> Any dispute, controversy or claim arising out of or relating to this

7      Agreement shall be settled promptly by arbitration ... before a panel of three (3)

8      arbitrators, in accordance with the then applicable rules of the American Arbitration

9      Association .... All determinations made by a majority of the arbitrators shall be

10      final, conclusive and binding on all parties hereto and judgment upon the award

11      entered by a majority of the arbitrators may be entered in any court having

12      jurisdiction. [CR #26, Exhibit A]

13      4.      Section 13.7 of the Agreement states in pertinent part:

14      <u>Costs.</u> If the Company or any Member retains counsel for the purpose of enforcing

15      or preventing the breach or any threatened breach of any provision of this Agreement

16      or for any other remedy relating to it, then the prevailing party will be entitled to be

17      reimbursed by the nonprevailing party for all costs and expenses so incurred

18      (including reasonable attorney's fees, costs of bonds, and fees and expenses for

19      expert witnesses). [CR #26, Exhibit A]

20      5.      On January 24, 2005, DGI and Haber filed their Non-Opposition to Sidley's Motion

21 to Compel Arbitration (CR #31).

22      6.      On March 3, 2005, Mrs. Mort filed her First Amended Complaint adding a securities

23 fraud claim (CR #34).

24      7.      On March 28, 2005, this Court entered a Stipulation and Order staying the Case

25 Pending Completion of Arbitration Proceedings (CR #37) (hereinafter "the 3/28/05 Order").

26      8.      On April 29, 2005, Mrs. Mort filed her Demand for Arbitration and Supporting

27 Statement with the American Arbitration Association and was assigned AAA Case No. 13 152 Y

28 01036 05.

9.    The Arbitration proceedings were stayed pending resolution of a related criminal case against Ruble. *U.S. v. Stein,* Case No. S1-05-CR-888 (LAK)(S.D.N.Y.).[6]   The *Stein* Second Superceding Indictment alleges in pertinent part at ¶51:

> Many of the SOS transactions marketed by the defendants ... CARL HASTING[7] ... to KPMG clients were arranged and implemented by a tax shelter firm located in New York, New York (the "Shelter Boutique" [aka DGI]). ...  The principal of the Shelter Boutique *is a co-conspirator not named as a defendant herein ("cc 10" [aka James Haber]).* [Emphasis added][8]

10.    In early January, 2008, Sidley arranged a mediation proceeding which resulted in a Settlement between Sidley, Ruble and Mort on January 10, 2008; although counsel for Haber/DGI attended the mediation, they declined to mediate or otherwise negotiate in good-faith.

11.    Following execution of the settlement with Sidley/Ruble, on January 28, 2008, Haber moved to dismiss arbitration asserting in pertinent part:

> In light of the recent settlement between Claimant and Respondents Sidley Austin LLP and Mr. Ruble (collectively referred to as "Sidley"), The Diversified Group Incorporated and James Haber (collectively referred to as "DGI"), request that the Panel dismiss Mort's remaining claims against DGI as moot.  Further, if the Panel does not dismiss the case, the arbitration costs should continue to be charged in the same proportion as before settlement; i.e., DGI pays for one-third of the fees and costs.
>
> ... Upon information and belief, the settlement amount exceeds all of Mort's out-of-pocket damages claimed in this case. * * * Claimant has settled with Sidley.  Mort's claims against Sidley involve the same injury that is asserted here against DGI.

---

[6] The criminal trial is scheduled to commence on September 22, 2008.

[7] Carl Hasting with KPMG referred the Morts' accountant to DGI and Haber to implement the Morts' OPS transactions.

[8] Haber's objections to Mort's discovery requests relating to these allegations, including Rule 6(e), F.R.Crim.P., were sustained by the Arbitration Panel.

Indeed, Claimant alleges that Sidley and DGI acted in connection with a single conspiracy.  Accordingly, the settlement ends this case. * * *Because we believe that Sidley already paid what Mort seeks in damages, this reduces the amount Mort can recover from DGI to zero.  Claimant cannot recover damages more than once.

12.  Following Mort's response to Haber's motion to dismiss, the panel denied the motion to dismiss, rejected the notion that Haber should only be required to pay one-third of the fees and costs, and scheduled a preliminary hearing for October 17, 2008, with the evidentiary hearing to follow on November 3, 4 and 5, 2008.

13.    On June 18, 2008, your undersigned engaged in settlement discussions with William B. Wachtel, Esq. ("Wachtel"), Haber's arbitration counsel; the context of the discussion was set forth by your undersigned in a letter e-mailed to Haber's arbitration counsel on Friday, June 20, 2008, which states in pertinent part:

This missive memorializes our telephone conversation June 18, 2008, beginning at approximately 3:30 P.M. (PDT) during which you informed me that you have been representing James Haber for twenty-six (26) years, he and your other client the Diversified Group ("DGI") are judgment proof and, even if Mrs. Mort prevails on the merits of her arbitration claim any judgment she obtains will be uncollectible. Accordingly, Mrs. Mort and I would be well advised to accept your $100,000, settlement offer – which you refused to put in writing.  You explained that you had settled twenty (20) of the twenty-two (22) cases brought against Haber and DGI on precisely those terms and even offered to increase the settlement if, ultimately, you paid more to settle the only other outstanding case.

... in response to my request that you provide me with documents or a written statement that judgment against Haber and/or DGI would be uncollectible, you refused.  You stated that I could contact Attorney David Deary to verify that the settlements reached with his clients were identical to the offer and explanation you provided to me by telephone June 18, 2006. * * * You responded, "Well, call David Deary, this is how I settle all of these cases ...."

1   I have been conducting an asset and lien search, but am unable to determine
2   conclusively whether Haber and/or DGI are, as you claimed, "judgment proof"
3   without Haber's social security number, birth date, and/or other unique identifier.
4   Please provide me with as much additional identification and/or other financial
5   information as possible to permit me to perform the search you suggested so that I
6   may advise my client appropriately concerning your settlement offer.  If I have
7   misstated or omitted any of our conversation please advise immediately....

8   *See Exhibit 1 attached hereto and incorporated herein as though set forth in full.*

9   14.   Immediately following the discussion with Wachtel, your undersigned placed a call
10  to David Deary, Esq., with the law firm of LOEWINSOHN FLEGLE DEARY LLP, 12377 Merit
11  Drive, Suite 900, Dallas, TX 75251, (214) 572-1700, and left a message asking him to return my
12  call.

13  15.   At 5:37 P.M., on June 20, 2008, Wachtel responded *via* email as follows:
14  Our settlement discussion was just that; a settlement discussion among colleagues.
15  The fact that you would write a self serving letter and ask me to confirm its accuracy
16  is not at all productive.  If your client wants to consider accepting $100,000 and
17  wishes to condition that offer on certain terms feel free make whatever proposal you
18  wish [sic]. Please do all of the due diligence you wish but don't expect me to spend
19  my time proving to you that I am a man of my word.

20  *See Exhibit 2 attached hereto and incorporated herein as though set forth in full.*

21  16.   On June 27, 2008, your undersigned spoke with Eliot Silverman, Esq., counsel for
22  Haber in the instant action, who admitted: (1) representing DGI and Haber for the past five (5) to six
23  (6) years;  (2)  knowing that Haber  was "uncollectible" and (3) that he had filed motions to compel
24  arbitration in other cases on behalf of Haber, stating that the "Munger law firm just got to it first in
25  Mort's case."[9]

26

27
_____

28  [9] In addition to the instant case, Mort is aware that Attorney Silverman represented Tax
Matters Partner Haber during the IRS' investigation of the tax scheme at issue instanter.

1    17.    After several additional unsuccessful attempts to speak with Attorney Deary, on July

2  1, 2008, your undersigned again called his firm and left a message with his Secretary Jan and asked

3  him to return my call.  Shortly thereafter Attorney Deary returned my call and we discussed his

4  dealings with Wachtel; Attorney Deary confirmed that he settled his clients' cases on the basis of

5  Wachtel's assertions that Haber was "uncollectible."

6    18.    Haber is not insolvent.  On the contrary, Haber is and has been paying for the legal

7  services and costs to his Attorney Silverman in the instant matter and William Wachtel, Esq., and

8  Howard Kleinhendler, Esq., of the New York law firm Wachtel & Masyr, LLP, in connection with

9  the related arbitration proceedings.  Likewise, Haber has been paying arbitration fees to AAA[10].

10    19.    Mort estimates (conservatively) that between 1996 and 2001 Haber received

11  somewhere between $50 and $100 million dollars.[11]  The following facts -- which are a matter of

12  public record -- amply support Mort's contention that this is a conservative estimate:

13    A.    As stated above, the Morts paid Haber $350,000. in "advisory fees."   Sidley

14        produced documents in Arbitration which reveal that Haber charged DGI clients

15        "advisory fees" ranging from $60,000. to $3,000,000. per scheme;[12]

16    B.    On May 23, 2007, Sidley entered into a non-prosecution cooperation agreement with

17        the Department of Justice and a Closing Agreement with the IRS and paid $39.4

18        million in tax shelter promoter penalties. Sidley admitted in the Closing Agreement

19        that it received $22,275,989. from Haber for  more-likely-than-not" tax opinions

20        rendered to clients – including Mort –   in connection with Haber's OPS/SOS

21  _____

22    [10] As Mr. Wachtel admitted – he has been representing Haber for the past 26 years.

23    [11]  Despite determining that punitive damages could be awarded, the Arbitration Panel
     sustained Haber's objections to all of Mort's discovery requests in connection with this issue.

24
25    [12] In 2003, KPMG admitted to the U.S. Senate Subcommittee investigating abusive and
     illegal tax shelter industry: (1) FLIP produced total gross revenues for KPMG of approximately 17
26   million over a four-year period (1996-1999); (2) OPIS generated approximately $28 million in
     revenue for KPMG over a two-year period (1998-1999); (3) BLIPS produced approximately $53
27   million over a one-year period from October 1999 to October 2000. *See* U.S. Senate Permanent
     Subcommittee on Investigations Minority Report dated November 18 & 20, 2003 re: *U.S. Tax*
28   *Shelter Industry: The Role of Accountants, Lawyers and Financial Professionals,* at p.3 n.1.

-7-

1    schemes;

2    C.    According to the Senate Subcommittee Reports Haber sold 600 fraudulent COBRA

3    tax shelters for an average price of at least $350,000., yielding gross receipts of

4    roughly $210 million dollars out of which DGI paid the law firm Jenkens & Gilchrist

5    between $30 and $45 million dollars for "more-likely-than-not" tax opinions

6    essentially identical to the Sidley  OPS tax opinion provided to the Morts in

7    connection with the scheme.[13]

8    20.    Haber never disclosed to Mort that: (1) Haber was concealing assets in fraud of

9    creditors and potential creditors; (2) notwithstanding the clear import of the arbitration clause, Haber

10    never intended in good faith and fair dealing to honor an adverse arbitration award; and (3) Haber

11    never intended to negotiate in good faith or deal fairly concerning any settlement of any controversy

12    arising in connection with the Agreement.  Furthermore, Haber never  disclosed that the arbitration

13    clause was merely Haber's trap to limit Mort's (and other adversaries') discovery into his multitude

14    of fraudulent schemes, undermine Mort's (and other adversaries') ability to bargain freely for a fair

15    settlement and  fraudulently induce Mort (and other  adversaries) to acquiesce to a deflated

16    settlement rather than litigate tort claims on the merits and seek an arbitration award for  damages,

17    including punitive damages, reasonable attorneys' fees and costs.

18    21.    Likewise, Haber concealed from this Court that the arbitration clause was fraudulently

19    induced by Haber concealing the facts that: (1) he willfully and fraudulently rendered himself

20    "uncollectible/judgment proof" by concealing assets in fraud of creditors and potential creditors;

21    (2) he never intended to honor any obligation arising from an adverse arbitration award; and (3) the

22    arbitration clause and concomitant Stipulated Order compelling arbitrations were integral to (a)

23    truncating discovery, undermining Mort's ability to bargain freely for a fair settlement and (b)

24    fraudulently inducing Mort to acquiesce to a substantially deflated settlement and dismiss  her tort

25    _____

26    [13]   Like it did with Sidley, on March 29, 2007, the U.S. government entered into a non-prosecution cooperation agreement with the law firm of Jenkens & Gilchrist, who: (1) accepted

27    responsibility for developing and marketing fraudulent COBRA, BLISS, BEST, OPS and BOSS tax shelters, (2) paid a civil fine of $76 million to the IRS for failing to register the aforementioned "tax

28    products," and (3) ceased practicing law as a firm.

1    claims.

2

3    **III.    ARGUMENT.**

4    **A.    This Court Has Jurisdiction To Vacate 3/28/05 Order.**

5         The 3/28/05 Order (CR #37) instanter is not a final order.  Accordingly, Mort's claim

6    regarding the agreement to arbitrate -- as well as her other claims -- remain before this Court.

7    Axiomatically, this Court has jurisdiction to adjudicate whether Mort's agreement to the arbitration

8    clause was based on fraud in the inducement and to vacate the Stipulation and Order entered on

9    March 25, 2005. *Sanford v. MemberWorks, Inc.,* 483 F.3d 956 (9th Cir. 2007).  There, Sanford

10   appealed the district court's order confirming an arbitration award in her action against

11   MemberWorks.  The Ninth Circuit vacated the order compelling arbitration and remanded for further

12   proceedings. *Id.*, at 963-64.  As *Sanford* held at 961-62:

13        We have addressed the post-*Randolph*[14] divide between appealable and non-

14        appealable orders compelling arbitration in a trio of cases.  In *Interactive Flight*

15        *Technologies, Inc. v. Swiss Air Transport Co.,* 249 F.3d 1177, 1179 (9th Cir. 2001),

16        we held that an order granting defendant's motion to compel arbitration and

17        dismissing the action without prejudice constitutes an appealable final decision.  By

18        contrast, in *Dees v. Billy,* 394 F.3d 1290, 1292-93 (9th Cir. 2005) we found that an

19        order compelling arbitration and staying the case was not immediately appealable.

20        *Dees* explained that this order was not final, despite the fact that the court ordered the

21        case "administratively closed," because "the trial court here did not dismiss

22        [plaintiff's] claim." *Id.* at 1292. The district court had compelled arbitration of the

23        plaintiff's malpractice claim, but its failure to dismiss the claim meant that "that

24        claim – although currently stayed – remains before the trial court." *Id.* At 1293.

25        Similarly, in *Bushley,* 360 F.3d at 1153, we found an order that compelled arbitration

26        without ruling on defendant's motion to stay or dismiss the claim is not "final and

27   _____

28        [14] *Green Tree Financial Corp.-Alabama v. Randolph,* 531 U.S. 79 (2000).

1    appealable" because the action was "effectively stayed pending the conclusion of the

2    [] arbitration."

3     Applying these principles to the case at bar yields the inescapable conclusion that

4    the July 2002 order was not a "final decision with respect to an arbitration."  While

5    the order compelled Sanford to arbitrate her claims against MemberWorks, the

6    district court did not dismiss those claims. ...  Defendants point out that no "live"

7    claims remained before the court, which later explained that it would only entertain

8    motions relating to the arbitrator's final award.  But this posture is no different than

9    that presented in *Dees*, where the case was "administratively closed" pending the

10   results of arbitration. *Dees,* 394 F.3d at 1292.  Because Sanford's claims were not

11   dismissed, they "remain[ed] before the trial court," *id.* At 192, and at most could be

12   described as "effectively stayed pending the conclusion of the []arbitration," *Bushley,*

13   360 F.3d at 1153.

14   **B.     This Court, Not The Arbitrators, Must Decide Whether Haber Fraudulently Induced**

15   **Mort To Agree To The Arbitration Clause.**

16          Pursuant to the Federal Arbitration Act, written agreements to arbitrate a dispute such as the

17   instant matter are "valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in*

18   *equity for the revocation of any contract.*" 9 U.S.C. §2 (emphasis added).  The Federal Arbitration

19   Act further provides that "[i]f [fraud in] the making of the arbitration agreement ... be in issue, the

20   court shall proceed summarily to the trial thereof." 9 U.S.C. §4.  When there is a claim of fraud "in

21   the inducement of the arbitration clause itself – an issue which goes to the 'making' of the agreement

22   to arbitrate – the federal court may proceed to adjudicate it." *Prima Paint Corp. v. Flood & Conklin*

23   *Mfg. Co.,* 388 U.S. 395, 403-404 (1967); *AT &T Technologies Inc. v. Communications Workers,* 475

24   U.S. 643, 649 (1986) ("[T]he question of arbitrability is undeniably an issue for judicial

25   determination.  Unless the parties clearly and unmistakably provide otherwise, the question of

26   whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.").

27          The Supreme Court's caveat in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,*

28          *Inc.* 473 U.S. 614, 627 (1985), is apropos:

-10-

1  [C]ourts should remain attuned to well-supported claims that the agreement to

2  arbitrate resulted from the sort of fraud or overwhelming economic power that would

3  provide grounds "for the revocation of any contract." 9 U.S.C. §2.

4  **C.  Mort's Agreement To The Arbitration Clause Was Induced By Fraudulent**

5  **Concealment.**

6  As the Ninth Circuit pronounced:

7  In analyzing whether an arbitration agreement is valid and enforceable, "generally

8  applicable contract defenses, such as fraud, duress, or unconscionability, may be

9  applied to invalidate arbitration agreements without contravening §2."

10  *Nagrampa v. Mailcoups, Inc.,* 469 F.3d 1257, 1268 (9th Cir. 2006), quoting, *Doctor's Associates, Inc*

11  *v. Casarotto,* 517 U.S. 681, 687 (1996).   According to Section 13.21 of  the Agreement the

12  substantive law of New York governs the instant controversy.

13  Under New York law:

14  "[I]nstead of an affirmative misrepresentation, a fraud cause of action may be

15  predicated on acts of concealment where the defendant had a duty to disclose

16  material information." ...   We have explained that "[d]uring the course of

17  negotiations surrounding a business transaction, a duty to disclose may arise in two

18  situations: first, where the parties enjoy a fiduciary relationship, and second, where

19  one party possesses superior knowledge, not readily available to the other, and knows

20  that the other is acting on the basis of mistaken knowledge."…. [S]uch a duty "usually

21  arises ... in the context of business negotiations where parties are entering a

22  contract."…

23  *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 291-93 (2nd Cir. 2006) (citations omitted); *see also, e.g.,*

24  *Steward v. Jackson & Nash,* 976 F.2d 86, 89 (2nd Cir. 1992) ("'While [m]ere promissory statements

25  as to what will be done in the future are not actionable, ... it is settled that, if a promise was actually

26  made with a preconceived and undisclosed intention of not performing it, it constitutes a

27  misrepresentation of material existing fact upon which an action for rescission [based on fraudulent

28  inducement] may be predicated.'"), *quoting  Sabo v. Delman,* 3 N.Y.2d 155, 160, 164 N.Y.S.2d 714,

-11-

1   716 (N.Y. 1957);  *Danann Realty Corp v. Harris*, 5 N.Y.2d 317, 320, 184 N.Y.S.2d 599 (1959)

2   ("[W]here the complaint states a cause of action for fraud, the parol evidence rule is not a bar to

3   showing the fraud either in the inducement or in the execution," despite a general merger clause).

4        In New York, a fiduciary relationship arises between two persons "when one of them is under

5   a duty to act for or to give advice for the benefit of another upon matters within the scope of the

6   relation." *EBCI, Inc. v.. Goldman Sachs & Co.,* 5 N.Y.3d 11, 19, 799 N.Y.S.2d 170 (2005).  Here,

7   Haber/DGI held themselves out as having expertise as financial advisors on investments in foreign

8   currency options and complex income tax strategies based thereon.  Where, as here, Haber/DGI

9   assumed the role of investment advisors, a fiduciary relationship existed between the Morts and

10  Haber in connection with the OPS transaction. *Talansky v. Schulman,* 2 A.D.3d 355, 360, 770

11  N.Y.S.2d 48, 53 (N.Y.A.D. 1 Dept 2003) ("To claim that a business transaction gave rise to a

12  fiduciary relationship, plaintiff must show that defendant had superior expertise or knowledge about

13  some subject and misled plaintiff by false representations concerning that subject."); *Davis v. CCF*

14  *Capital Corp.,* 277 A.D.2d 342, 717 N.Y.S.2d 207 (N.Y.A.D. 2nd Dept., 2000) (holding a fiduciary

15  relationship existed between clients and investment advisor).

16       Haber/DGI's undertaking as Morts' advisor of the OPS transaction put them in a position of

17  trust and superior knowledge, in which they had a duty to act honestly and make full disclosure of

18  any and all material facts, including all material facts which affected performance of the arbitration

19  clause.

20       "[A] fiduciary owes a duty of undivided and undiluted loyalty to those whose

21       interests the fiduciary is to protect.  This is a sensitive and 'inflexible' rule of fidelity,

22       barring not only blatant self-dealing, but also requiring avoidance of situations in

23       which a fiduciary's personal interest possibly conflicts with the interest of those owed

24       a fiduciary duty." .....  Thus, there is an obligation of utmost candor ... strictly

25       obligating a fiduciary "to make full disclosure of any and all material facts within his

26       or her knowledge relating to a contemplated transaction with the other party to the

27       relationship." ... "[W]hen a fiduciary, in furtherance of its individual interests, deals

28       with the beneficiary of the duty in a matter relating to the fiduciary relationship, the

1   fiduciary is strictly obligated to make 'full disclosure' of all material facts." * * *

2   Indeed, where a fiduciary relationship exists between the parties, there must be clear

3   proof of the integrity and fairness of a transaction between them, "' or any instrument

4   thus obtained will be set aside or held as invalid.'"

5   *Ajettix Inc. v. Raub,* 9 Misc3d 908, 912-14, 804 N.Y.S.2d 580, 588-89 (N.Y.Sup. 2005)(citations

6   omitted); *Kaufman v. Cohen,* 307 A.D.2d 113, 119-20, 760 N.Y.S.2d 157, 165 (N.Y.Sup. 2003)

7   ("[W]here a fiduciary relationship exists, 'the mere failure to disclose facts which one is required

8   to disclose may constitute actual fraud, provided the fiduciary possesses the requisite intent to

9   deceive.'")(citation omitted).

10      In sum, the Morts' agreement to the arbitration clause was fraudulently induced  by

11  Haber/DGI's concealment of the material facts set forth *supra,* which they had a duty to disclose.

12  **D.    Fraud In the Inducement To Settle Is Persuasive Evidence Of Fraud In The**

13  **Inducement Of Agreement To The Arbitration Clause .**

14  _____Utilization of Haber's fraudulent concealment of assets in fraud of creditors and potential

15  creditors as a "hammer-and-anvil" to induce settlement of claims for less than fair value constitutes

16  fraud in the inducement to settle. *Living Designs, Inc. v. E.I. Dupont de Nemours and Co.,* 431 F.3d

17  353 (9th Cir. 2005) (holding plaintiffs stated a RICO claim against manufacturers,  it's attorneys and

18  expert witnesses based on a RICO settlement enterprise); *Fuku-Bonsai, Inc. v. E.I. Du Pont de*

19  *Nemours and Co.,* 187 F.3d 1031, 1034 (9th Cir. 1999) ("plaintiffs' claim for fraudulent inducement

20  is not barred by the release language in the product liability settlement agreement.  DuPont's

21  fraudulent actions and lack of good faith negotiations undermined plaintiffs' ability to bargain freely

22  for a fair settlement."); *Matsuura v. Alston & Bird, P.C.,* 166 F.3d 1006 (9th Cir. 1999) (commercial

23  nurserymen who entered into settlement in product liability against fungicide manufacturer brought

24  action against manufacturer and it's lawyers for fraud in the inducement of the settlement); *and In*

25  *re E.I. du Pont,* No. 4:95-CV-36 (HL)(M.D.Ga. 1998) (referring fraud allegations against

26  manufacturer and law firm to U.S. Attorney's Office, but ultimately approving a civil settlement

27  resolving the matter, which required DuPont and it's lawyers to make payments totaling $11.25

28  million dollars).

1        The fraud in the inducement to settle is persuasive evidence of the fraud in inducing the

2  Morts' agreement to the arbitration clause.  As the court in *U.S. v. Philatelic Leasing, Ltd.,* 601

3  F.Supp. 1554, 1565-66  (S.D.N.Y. 1985), *aff'd,* 794 F.2d 781 (2nd Cir. 1986), observed in footnote

4  10:

5        Wigmore's full statement of this proposition appears at 2 Wigmore, Evidence §278

6        [Chadbourne rev. 1979] at 133, as follows:

7            It has always been understood – the reference, indeed, is one of the

8            simplest in human experience – that a party's *falsehood* or *other*

9            *fraud* in the preparation and presentation of his cause, his fabrication

10          or suppression of evidence by bribery or spoliation, and all similar

11          conduct is receivable against him as an indication of his

12          consciousness that his case is a weak or unfounded one; and from that

13          consciousness may be inferred the fact itself of the cause's lack of

14          truth and merit.  The inference thus does not necessarily apply to any

15          specific fact in the cause, but operates, indefinitely though strongly

16          against the whole mass of alleged facts constituting his cause.

17          (Emphasis in original).

18  **IV.**    **CONCLUSION.**

19        For all the foregoing reasons this Court should vacate its Order staying this case, reinstate

20  it on the Court's active docket and authorize the parties to utilize the full panoply of procedures

21  available to litigating parties in this Court, including without limitation discovery of all evidence

22  reasonably calculated to lead to the discovery of admissible evidence.

23        RESPECTFULLY SUBMITTED this 30th day of July, 2008.

24                WILLIAM A. COHAN, P.C.

25                By: *s/ William A. Cohan*
                    WILLIAM A. COHAN

26

27                Attorney for Plaintiff Cindy Mort

28